IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NICOLE D. SEDILLOS,

      Plaintiff,

vs.                                    No. CIV 10-236 JB/LFG

MICHAEL J. ASTRUE,
Commissioner,
Social Security Administration,

      Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on Plaintiff Nicole E. Sedillos' ("Sedillos") Motion to Reverse or Remand for a Rehearing, with Supporting Memorandum, filed September 9, 2010. [Doc. 18.]  The Commissioner of Social Security issued a final decision denying benefits, finding that Sedillos was not disabled and not entitled to Disability Insurance Benefits ("DIB").  The Commissioner filed a response to Sedillos' Motion [Doc. 20], and Sedillos filed a reply [Doc. 21]. Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court recommends that Sedillos' motion be granted and that this matter be remanded for additional administrative proceedings.

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed by **February 14, 2011**, no appellate review will be allowed.

## I.    **PROCEDURAL RECORD**

On June 22, 2007, Sedillos applied for DIB, alleging an initial onset date of June 15, 2007 [AR 83], due to fibromyalgia, diabetes, depression, anxiety, and kidney failure.  [AR 38, 104.] She further asserted at the ALJ hearing that she could not perform full time work because of pain, headaches, backaches, and "everything." [AR 25.]  Sedillos amended her alleged onset date to July 9, 2008, because she had performed full time work in late 2007 through early July 2008. [AR 21-24.]

Sedillos' DIB application was denied at the initial and reconsideration levels. [AR 36-38, 43.]  On February 27, 2009, the ALJ conducted an administrative hearing in Santa Fe, New Mexico, at which Sedillos was represented by counsel.  [AR 21-33.]  On July 29, 2009, the ALJ issued a decision finding Sedillos not disabled. [AR 9-20.]  Thereafter, Sedillos filed a timely request for review.  On January 29, 2010, after considering additional evidence, the Appeals Council denied Sedillos' request for review and upheld the final decision of the ALJ.  [AR 1.]  On March 15, 2010, Sedillos filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Sedillos was born on June 13, 1972 [83] and was 36 years old at the time of the ALJ hearing. [AR 83.] She has a high school education, is married with two children, and lives in Las Vegas, New Mexico. [AR 83, 86, 110.]

Sedillos worked as a substitute teacher from 2003-2004.  From 2001-2006, she was self-employed, operating a small daycare business out of her home part-time.  She was an administrative assistant for a non-profit organization from September 2006 to June 2007.  She worked at the front desk of a Super 8 Motel for one month from October 2007 to November 2007.  Sedillos' earnings history is erratic.  She had no earnings or very little from 1991 to 2000.  From 2001-2006, her annual earnings ranged from $3600 to $9600.  In 2007, the year she initially alleged onset of disability, she earned over $15,000.  [AR 93.]

2

## II.   <u>STANDARDS FOR DETERMINING DISABILITY</u>

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[8] age, education and past work experience, she is capable of performing other work.[9]

At step five, the ALJ can find that the claimant met her burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

 In this case, the ALJ did not address any questions to the vocational expert present at the hearing.  The ALJ made alternative findings at steps four and five, which are discussed below. [AR 19-20.]

The Court observes, similar to Sedillos' argument [Doc. 18, p. 3], that the ALJ mistakenly recited the burden of proof at step five of the sequential process.  In the decision, the ALJ stated that the "claimant generally continues to have the burden of proving disability at this step [step five]," although "a limited burden of going forward with the evidence shifts to the Social Security Administration."  [AR 14.] This is an incorrect statement of law.[11]

---

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

[11]Most, if not all, of the ALJ decisions presented to this Court recite similar boilerplate language summarizing the five-step process.  That summary should be reviewed and revised in accordance with Tenth Circuit law.

The Tenth Circuit Court of Appeals previously explained if the claimant establishes at step four that she cannot return to her past relevant work, the burden of proof shifts to the Commissioner at step five to show the claimant retains the RFC to perform work in the national economy, given her age, education and work experience.  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). In an unpublished opinion, the Tenth Circuit further stated that "[t]he claimant has no burden on step five."  Stewart v. Shalala, 999 F.2d 548, at *1 (Table, Text in Westlaw), 1993 WL 261958 (10th Cir. Jun. 28, 1993) (citing Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)).  Thus, the ALJ's explanation of the claimant's burden at step five is not in accord with circuit law.  Even if it caused no error in this case, the ALJ should revise its boilerplate summary of the five-step process.

## III.   **STANDARD OF REVIEW**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is or is not disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of all the evidence" [AR 12], the ALJ denied Sedillos' request for DIB. [AR 12-20.] The ALJ found that Sedillos had not been engaged in substantial gainful activity since the amended onset date of July 9, 2008. [AR 14.]  The ALJ also found that Sedillos had severe impairments of fibromyalgia and migraine headaches, but that none of the impairments or combination of impairments met or medically equaled a listing impairment. [AR 14-16.]

In addition, the ALJ determined, based on the medical records and clinical findings, that Sedillos' diagnosis of diabetes did not cause more than minimal limitations in her ability to perform basic work activities and thus, was not a severe impairment.  The ALJ made similar findings as to Sedillos' alleged kidney problems, degenerative disease of the spine, mental impairments, and jaw problems. [AR 15-16.]

After "careful consideration of the entire record," the ALJ determined that Sedillos had the RFC to perform a full range of light work and could perform past relevant sedentary to light work as a substitute teacher, childcare provider, administrative assistant, and clerk with a finance company. [AR 15-19.] Alternatively, after considering Sedillos' younger age, education, work experience, and RFC, the ALJ concluded there were jobs existing in significant numbers in the national economy that she could perform.  In the alternative step five finding, the ALJ relied exclusively on the grids.  [AR 19-20.]

## IV.   MEDICAL HISTORY AND BACKGROUND

The administrative record [AR] in this case consists of 677 pages, 245 of which were presented to the Appeals Council, after the ALJ made his decision. [Doc. 18, p. 2.] The Court observes that a number of the records are duplicates (*see, e.g.,* AR 492, 493, 617, 622, 675; 618, 620; 432, 443; 192, 343), and that because of Sedillos' multiple one-day (or less) hospital admissions, there are many extraneous administrative documents, along with pages of lab results and descriptions of medications given, that are of no assistance in resolving this matter (*see, e.g.,* AR 212, 222-23; 530-32; 542, 558-60; 589, 590).

There is a single medical record, dated September 23, 2003, when Sedillos saw Dr. Dimmette, a neurologist, for complaints of intermittent headaches.  The physical examination was normal.  Diagnoses for fibromyalgia, diabetes and hematuria were noted.  The neurologist concluded Sedillos had "common migraine headaches." [AR 374.]

There are no medical records from 2004.  Sedillos provided many medical records from 2005-2009.  However, the ALJ noted that while he reviewed all of the medical evidence, he placed more weight on the evidence after and near the amended onset date of July 9, 2008, based on Sedillos' ability to work and her testimony that she continues to seek employment. [AR 17.] Plaintiff

noted that the relevant time period, based on the amended onset date, included one year prior to July 9, 2008. [Doc. 18, n. 3.]

**2005**

In 2005, Sedillos provided child daycare services in her home on a part-time basis. [AR 158.]

In March 2005, x-rays of Sedillos' thoracic and cervical spine were normal. [AR 268-69.] On July 8, 2005, Sedillos saw her primary care physician ("PCP"), Dr. Marianne Luchini, at San Miguel Clinic. She was there to follow up on glucose testing. There was no evidence of insulin resistance at this time. Dr. Luchini noted Sedillos had fibromyalgia with chronic pain "with psychiatric component overlay." She encouraged counseling for Sedillos again and made a referral to the pain clinic. There are no medical records related to counseling or treatment at a pain clinic during this time frame. Sedillos was given a prescription for 60 Hydrocodone (also known as Lortab),[12] and she signed a "drug contract" with the physician, requiring Sedillos to keep monthly appointments before receiving any refills for narcotic pain killers. [AR 262, 265.]

On July 26, 2005, Sedillos was admitted to the Alta Vista Regional Hospital for short stay. She complained of pain in various areas, including the lower back. Past medical history indicated anxiety, fibromyalgia, chronic pain, and prediabetes. She was given Darvocet[13] and discharged. She was also given a non-steroidal injection of Toradol (non-narcotic analgesic, but sometimes prescribed together with a narcotic analgesic) which reduced her level of pain. [AR 211-220.]

_____

[12]Lortab's generic name: acetaminophen and hydrocodone. "Hydrocodone is in a group of drugs called narcotic pain relievers. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone. The combination of acetaminophen and hydrocodone (Lortab) is used to relieve moderate to severe pain." www.drugs.com

[13]Darvocet is a combination medication is used to treat mild to moderate pain. Propoxyphene is a narcotic pain reliever (opiate-type) that acts on certain centers in the brain to give you pain relief. Acetaminophen is a non-narcotic pain reliever. www.webmd.com

On July 27, 2005, Sedillos did not show up for her appointment with the Health Centers of Northern New Mexico ("HCNNN"). [AR 261.] On September 13, 2005, HCNNN denied her request for a Lortab refill because she missed her appointment, contrary to the requirements of the drug contract.  [AR 260, 266.] On September 22, 2005, Sedillos was seen at the HCNNN for neck, shoulder, and back pain.  This record notes that Sedillos was last seen in April by Dr. Luchini who had given her refills.  There is no corresponding April 2005 medical record.  The health care provider explained to Sedillos that HCNNN did not provide refills on controlled substances. [AR 259.]

On October 7, 2005, Sedillos was seen by Dr. Luchini. The medical record indicates a long history of fibromyalgia and chronic pain.  Her care had been transferred to San Miguel Clinic for follow up on complaints of chronic pain for which Sedillos was prescribed Hydrocodone (60 tablets per month) "per pain contract."  Dr. Luchini talked to Sedillos about treatment for her depression and exercise for fibromyalgia.  Sedillos had not been successful in reducing her weight and she did not exercise regularly.  Dr. Luchini discussed counseling with Sedillos, who was very uncertain about it although she said she would try it.  Because Sedillos' husband had bipolar disorder, Sedillos felt she knew all about depression and was doing fine most of the time with the anti-depressant prescription of Lexapro.  Dr. Luchini assessed Sedillos with fibromyalgia and chronic pain but against stated she "suspected a large psychiatric component to this."  Dr. Luchini wanted Sedillos to attend counseling and also referred her to pain management again.  She refilled a prescription of Lortab, but instructed Sedillos that she was not allowed any  "replacement" prescription or early refills.  Dr. Luchini stated she would not refill the prescription "until we have agreed to a different course of action." [AR 256-57.]

9

On November 9, 2005, Dr. Luchini saw Sedillos for fibromyalgia and "chronic narcotics." Sedillos complained of an acute migraine that day. She had migraine headaches regularly, 4-6 times a month. She stated that her husband was "disabled" and depressed. She admitted to taking some of her husband's Lorazepam[14] to help her sleep. Dr. Luchini assessed Sedillos with fibromyalgia and chronic pain. She provided Sedillos with another prescription of Hydrocodone and also gave her an injection of Toradol. [AR 254.] Sedillos' anti-depressant medication, Amitriptyline,[15] was increased to 50 mg.

On December 9, 2005, Sedillos was seen at the HCNNN with complaints of pain in her shoulder, neck, back and right calf. No medication for her headaches helped. The records indicates that Sedillos had not kept an appointment with Virginia McNally and had not scheduled an appointment with Dr. Williams. She had canceled her appointment with a counselor. She was given Toradol and a refill of Lortab. [AR 253, 266.]

**2006**

In 2006, Sedillos continued to provide daycare out of her home. She also worked as an administrative assistant for a nonprofit agency from September 2006 through June 2007. [AR 158.]

On January 16, 2006, Sedillos had a renal ultrasound for hematuria (red blood cells in urine). The test results were not significantly remarkable, but a CT scan would provide a better evaluation. [AR 166.] On March 14, 2006, Sedillos had further testing at St. Vincent's Regional Medical Center. The CT of her abdomen/pelvis was essentially normal. [AR 170, 175.]

_____

[14]Lorazepam is a medication used to treat anxiety. Lorazepam belongs to a class of drugs known as benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect. www.webmd.com

[15]Amitriptyline "is used to treat mental/mood problems such as depression. It may help improve mood and feelings of well-being, relieve anxiety and tension, help you sleep better, and increase your energy level." www.web.com

On March 21, 2006, Sedillos was admitted for part of a day at Alta Vista Regional Hospital. She complained of left flank pain, that had started several days earlier and said it was the "worst pain ever." She was able to ambulate independently and could perform daily living activities without assistance.  She was given an injection of Toradol and discharged. [AR 225, 229.]

On April 9, 2006, Sedillos was seen at the Las Vegas Medical Center Community Based Services Division.  The 2-page document may be an intake form for counseling.  It contains little information other than assessments of adjustment disorder with anxiety and depressed mood.  The diagnoses of fibromyalgia, prediabetes, chronic microscopic hematuria, and migraine headaches are recorded.  Sedillos had problems with her primary support group, finances, and access to health care. Her GAF was assessed at 60. [AR 206.]

On August 8, 2006, Sedillos was seen at HCNNN.  The notes indicate she had edema in her legs and hands, and pain, "more so since PT." [AR 252.] However, no physical therapy records were made part of the administrative record.  On August 9, 2006, Sedillos was seen by Irene Sandoval, a therapist. [AR 201.] Sedillos stated she had learned a lot of coping skills from her husband's treatment for mental health problems.  He withdrew and isolated himself unlike Sedillos who could get out when she felt anxious or depressed. [AR 201.]

There is a typed evaluation, signed August 23, 2006, by Dr. Lawrence Lazarus, Staff Psychiatrist with the New Mexico Behavioral Health Institute, Community Based Services Division. [AR 343-45; duplicate record at 192-94.] This was Sedillos' first psychiatric outpatient evaluation at this clinic.  The records states Sedillos was employed, doing in-home daycare for several young children in her neighborhood, and that she lived with her husband who was "disabled from an old back and knee injury." [AR 343.]  She also thought that her husband might have a "borderline bipolar" illness. [AR 344.]

11

Dr. Luchini had referred Sedillos to Dr. Lazarus.  Sedillos described herself as being very active and happy until about five years ago when she started developing symptoms of fibromyalgia, including leg cramps and pain in the neck, lower back and shoulders.  She also had headaches and jaw pain and was "finally diagnosed about a year or two later with having fibromyalgia."  There is no contemporaneous medical record from 2003-2004 indicating testing for fibromyalgia with that diagnosis.  Amitriptyline helped reduce pain and improved her sleep to some degree.  However, because of symptoms of anxiety and depression, one of her doctors started her on Lexapro.  It tended to make her more tired, so she was changed to Cymbalta along with Amitriptyline.  Cymbalta helped with anxiety but did not help much with fibromyalgia pain.  When Sedillos was in severe pain, she took one to two Lortab a day.  She also was told she had a prediabetic condition and occasional problems with hematuria. [AR 343.]

Because of depression, Sedillos' weight increased from 130 to 170 pounds during the past year.  She complained of sleep problems and was scheduled for a sleep study.  She denied any thoughts of suicide and stated her depression was directly related to fibromyalgia pain. [AR 344.]

Dr. Lazarus found that Sedillos seemed "in obvious pain as expressed by her having to change her seating position during the interview."  She grimaced as if she were in pain.  She attributed "her mild depression to the pain and discomfort and increased fatigue that she believes is secondary to her fibromyalgia." [AR 344.]

Dr. Lazarus provided diagnoses of depressive disorder secondary to general medical condition (fibromyalgia); fibromyalgia, prediabetic, intermittent hematuria, etiology unclear; chronic pain and discomfort secondary to fibromyalgia.  He assessed her with a GAF of 70.  Dr. Lazarus increased the Cymbalta prescription and asked to see her in 3-4 weeks.  Sedillos was to see Irene

Sandoval for psychotherapy which Dr. Lazarus felt would be of assistance. [AR 345; *see also* AR 178-187.]

On September 21, 2006, Sedillos did not show up for her counseling appointment. [AR 198.]

On December 14, 2006, Sedillos had an annual exam. She was taking Amitriptyline, Cymbalta, Lexapro, and Ibuprofen. Her pain was stable. Her depression was "better." She had obtained a job as an administrative assistant. [AR 251.] According to work history records, Sedillos started this job in September 2006. [AR 158.]

**2007**

Sedillos worked as an administrative assistant until June 2007. Her initial alleged onset date for disability was June 15, 2007. [AR 83.] She worked at a Super 8 Motel for a month, from October to November 2007. She worked at Security Finance from November 2007 to July 2008. [AR 158.]

In January 2007, Sedillos underwent a CT urogram at UNM Hospital. The test did not reveal any stones or filling defects in the renal collecting system or ureter. There were lesions in the bladder consistent with cystitis cystica, but no tumors or foreign bodies. Sedillos was advised to follow up with her primary care doctor as needed. The exam was "unremarkable." [AR 284, 286, 290.]

On January 27, 2007, Sedillos was admitted to Alta Vista Regional Hospital for a short time. She appeared anxious and nervous and ineffective at coping. She rated her headache pain as a 10

out of 10, the "worst ever."  She was given an injection of Compazine[16] and discharged after her pain level was reduced. [AR 232-35.]

In March or April 2007, Sedillos was discharged from psychotherapy treatment at the New Mexico Department of Health.  The notes indicate she came to the first therapy session on July 20, 2006 but did not return. [AR 178-87, 191, 195.]

On April 30, 2007, Sedillos was seen at HCNNN for lower back, neck, and right shoulder pain.  She requested trigger point injections. [AR 250.]

On June 11, 2007, Sedillos was seen for back pain.  She believed her pain was due to work stress at this time. [AR 249.] On June 12, 2007, Sedillos was seen at Alta Vista Emergency Room where she was diagnosed with acute pharyngitis. [AR 241-42.]

June 15, 2007 was the original onset date of disability alleged by Sedillos, but then later amended.  On June 22, 2007, she filed her application for DIB. [AR 81, 83.] Dr. Luchini wrote a letter, dated June 22, 2007, stating that she had been Sedillos' PCP since 2005.  Sedillos was under Dr. Luchini's care for fibromyalgia, depression, anxiety, and interstitial cystitis. [AR 247.]

There is an undated disability report that may have been completed near this time. [AR 103.] Sedillos stated that "fibromyalgia, diabetes, depression, anxiety, and kidney" caused pain that interfered with her ability to work on June 15, 2007. [AR 104.] Sedillos reported that she had stopped working as of this date because of her medical condition. [AR 104.] This turned out to be

---

[16]"Prochlorperazine (Compazine, Stemzine, Buccastem, Stemetil, Phenotil) is a dopamine (D2) receptor antagonist that belongs to the phenothiazine class of antipsychotic agents that are used for the antiemetic treatment of nausea and vertigo. It is also a highly-potent typical antipsychotic, 10-20x more potent than chlorpromazine. It is also used to treat migraine headaches."
http://en.wikipedia.org/wiki/Prochlorperazine

inaccurate, since she worked at the Super 8 Motel and at Security Finance for a total of about nine months after the initial alleged onset date. [AR 158.]

Social Security Administration notes, dated August 14, 2007, requested assessments of Sedillos' mental and physical RFCs.  The request for medical advice as to the RFC assessments reports that Sedillos had consistent treatment with narcotics but only subjective allegations.  Testing was negative.  While her kidneys had cystitis cystica, the problem did not limit her functioning. Sedillos had not responded to the agency's requests for information or returned requested forms. [AR 295, 296.]

On August 15, 2007, Dr. Gabaldon, an agency physician, stated there was insufficient evidence to evaluate Sedillos' psychiatric functioning. [AR 297.]

On August 20, 2007, Dr. Margaret E. Vining, an agency physician, filled out an RFC, assessing Sedillos' physical limitations.  Dr. Vining found that Sedillos could lift 50 pounds occasionally, 25 pounds frequently, and sit, stand, or walk for a period of six hours.  She was unlimited in her ability to push or pull.  Sedillos alleged fibromyalgia, diabetes, depression, anxiety, and renal failure. [AR 311.] The diagnosis of fibromyalgia is always present in the medical records from 2005 to the present.  Sedillos presented with pain in her back, shoulders, legs at times, flanks, and pelvic area.  She was taking anti-inflammatory medications, opioid pain relievers, and Amitriptyline.  She often received trigger point injections.  Dr. Vining observed that while the medical evidence did not contain the original evaluation for the diagnosis of fibromyalgia, this was a well established impairment. [AR 312.] Sedillos also had a diagnoses of prediabetes or mild glucose intolerance which she handled through diet and exercise.  Her cystitis cystica presented with symptoms of hematuria and bladder discomfort, but no evidence of renal failure and no limitations associated with that diagnosis.  The MRI of her spine was negative.  Sedillos had a history of

15

treatment for migraines.  However, Dr. Vining commented that there was medical evidence of an emotional overlay of symptoms. [AR 311-15.]

On August 20, 2007, Sedillos' initial application for DIB was denied because her alleged impairments were deemed not sufficiently severe. [AR 36, 38.]

On August 28, 2007, Sedillos was seen by Dr. Luchini for pain.  She was given trigger point injections. [AR 357.]

On August 30, 2007, Sedillos was again seen at the New Mexico Department of Health, New Mexico Behavioral Health Institute.  She was self-referred this time. [AR 326.] The interviewer found that Sedillos was depressed; her judgment was poor; her appearance and posture were "ok;" and her psychomotor activity was "retarded."  Sedillos suffered from chronic pain.  She had insufficient income and no insurance.  She was feeling "really awful" because she ran out of medications.  Her prior diagnoses were noted as fibromyalgia that was more painful since she stopped taking Cymbalta.  She had lost several teeth.  While she was seen previously at counseling services, she did not attend the scheduled appointments.  She only saw the psychiatrist on two occasions. [AR 326-29.] Her husband was mentally ill and disabled, and had heart disease.  Sedillos could perform the activities of daily living independently, but slowly.  She had help with household chores.  She had migraine headaches and sometimes took injections to alleviate the pain.  She was starting "site injections" for pain related to fibromyalgia.  She enjoyed camping, watching movies, and walking. [AR 323.]

On September 7, 2007, Sedillos was seen at El Centro Family Health clinic for pain.  She was due for refill of Lortab.  She also received trigger point injections.  [AR 355, 356.] On September 10, 2007, she was seen by Dr. Luchini for an "acute visit."  Sedillos felt acute pain in her

neck and back, and pain in her right shoulder and lower neck.  She was unhappy at her new job[17] and stated she had left her prior job due to conflict with staff. [AR 412.] Sedillos stated the trigger point injections had helped a lot. [AR 412.]

X-rays of her chest on September 10, 2007 were normal. [AR 349.]

On September 10, 2007, Sedillos' mother, Frieda Larranaga, filled out a third-party function report.  Ms. Larranaga visited Sedillos once or twice a week and stated Sedillos could no longer work outside the home, although work history records [AR 158] document the contrary.  Pain affected Sedillos' sleep and she needed help dressing.  Sedillos was able to go outside regularly; she drove a car, shopped and paid bills.  She had a difficult time financially because she no longer could work. [AR 122.]

During a face-to-face interview with disability services on September 20, 2007, Sedillos was observed to have problems sitting and walking.  "Appears to be in pain/walked slowly; sounds depressed. [AR 116.]

On October 19, 2007, a psychiatrist evaluated Sedillos.  The form is difficult to read but appears to say Sedillos lived with her husband and two children and was "employed." [AR 445.] Her PCP placed her on Cymbalta.  She was depressed, anxious, and tired.  Her anxiety was attributed to her pain.  She felt hopeless and frustrated.  Elavil helped her sleep.  She stated she had to leave her administrative assistant job because of pain. [AR 446.] However, an earlier record noted she left a job because of interpersonal conflict. [AR 412.] The doctor found that Sedillos had good insight, judgment, and impulse control.  She was diagnosed with "depression-manic depression" and

---

[17]It is not clear which job Sedillos is referencing since according to work history forms, she worked at the Super 8 Motel for one month, starting in October 2007, and then started at Security Finance in November 2007. [AR 258.]

"anxiety like panic." She was to restart Cymbalta, continue Elavil, and obtain Lortab from her PCP. She was referred to individual therapy. [AR 448.]

There is an undated disability appeal form, in which Sedillos stated she was experiencing more pain in her hands and feet. She was tired all of the time and felt more emotional. [AR 125-130.]

On October 30, 2007, Sedillos described her pain level was 7 and complained of depression. She worked at a Super 8 Motel front desk and had to stand. She loved her old job. [AR 411.]

On November 1, 2007, Sedillos was admitted to the Alta Vista hospital for a brief period. She complained of pain in multiple sites. Her chest CT was negative, and all labs were normal. The diagnosis was paraspinal muscle spasm. [AR 591-96.] Sedillos was given an injection of Toradol and prescriptions for Darvocet and Flexeril. The pain improved after the injection. [AR 600.]

On November 14, 2007, Sedillos did not show up for a counseling appointment. [*See* AR 440.]

On December 24, 2007, Sedillos was again admitted to the hospital for a short stay. She complained of pain in her back and chest. She was discharged with acute bronchitis. [AR 571, 582.]

### **2008**

During the first seven months of 2008, Sedillos continued to work at Security Finance.

On January 4, 2008, Sedillos saw her doctor for complaints of abdominal pain. Her bronchitis was improving. She received a refill for Lortab. [AR 406.]

On January 9, 2008, Sedillos' mother-in-law, Dolores Rael, filled out a third party function report, stating she had known Sedillos for 21 years. She did not know Sedillos' daily routines but knew she took care of her husband and children. Sedillos' children helped her around the house and helped her bathe and dress. Sedillos fixed simple meals daily and did the laundry and dishes.

18

Sedillos had bad days with pain and during those times was able to do less. [AR 133-38.] Sedillos wore a brace or splint but Ms. Rael did not know if it was prescribed. [AR 139.]

On January 15, 2008, Sedillos followed up with the physician for refills. [AR 405.

There is an undated disability report appeal noting that Sedillos felt very tired and had more pain.  These changes began December 1, 2007. [AR 145.] She had not seen a mental health care provider since her last disability report. [AR 145.] Sedillos had seen a provider at Alta Vista Ortho Specialists for knee and ankle pain and was prescribed physical therapy.  There are no corresponding medical records for physical therapy. [AR 144-48.]

On January 31, 2008, disability services requested medical advice for purposes of the request for reconsideration. [AR 362, 363.]

On February 5, 2008, David Green provided evaluated the medical records.  There was some new medical evidence, including an x-ray, dated September 2007, that was normal.  Sedillos had received trigger point injections.  The medium RFC completed August 20, 2007, regarding the initial request for DIB, was unchanged and was affirmed. [AR 364.]

On February 6, 2008, Dr. Scott Walker (psychiatrist) noted that while there was new medical evidence from New Mexico Behavioral Health, it was insufficient to perform a mental RFC.  A consultative examination was ordered but Sedillos did not attend.  In addition, Sedillos' third-party contact did not respond to communications from disability services.  Thus, the original evaluation of insufficient evidence, dated August 15, 2007, was affirmed. [AR 365.]

On February 7, 2008, Sedillos' request for reconsideration was denied. [AR 37, 43.]

On February 15, 2008, Sedillos saw Dr. Luchini for trigger point injections and a refill of Lortab.  Dr. Luchini noted that Sedillos was working long hours at a financial company and was

exhausted.  She exhibited an improved mood and outlook.  She described her job as the best she had

had and felt like she was helping someone.  The trigger point injections were deferred. [AR 404.]

On February 22, 2008, Sedillos was seen for pain in her ear, neck and shoulder.  She had

sinus problems. [AR 403.]

On March 5, 2008, there is a mental health administrative record indicating depression,

normal speech, memory in tact, normal orientation and average intelligence.  Sedillos' judgment was

poor. [AR 435-36.] Sedillos was in Georgia caring for her ill sister and tended to others' medical

needs over her own.  Sedillos stated she felt awful because she ran out of medications.  This record

indicates that therapy services for Sedillos were discontinued as Sedillos did not show up for a

November 14, 2007 appointment and did not respond to a letter of inquiry.  Psychiatric services

were to be continued. [AR 440.]

On March 16, 2008, Sedillos was admitted to Alta Vista hospital for a short stay.  She

complained of leg and joint pain, cramps, and back pain.  She suffered from generalized weakness

and fatigue.  There was a moderate amount of tenderness upon examination and a moderate amount

of soft tissue swelling.  The motor examination and all testing were normal. [AR 541, 544, 555.]

An injection of Toradol relieved Sedillos' pain. [AR 563.]

On April 4, 2008, Sedillos requested an ALJ hearing.  On April 14, 2008, she saw her

physician for trigger point injections.  She felt more tired and was sad appearing.  She was given

prescriptions for Lorazepam and Xanax. [AR 401.] On April 15, 2008, she had a physical

examination.  Lab results were positive for insulin resistance. [AR 396.]

On May 8, 2008, Sedillos saw her medical provider, complaining of pain.  She had severe

headaches, nausea, and exhaustion. [AR 390.] On that same day, she was admitted to the hospital

for another short stay.  She complained of tension or migraine headaches.  She was given Imitrex

at the clinic earlier but her headaches returned.  She had taken Lortab that morning. [AR 530-35.] At the hospital, Toradol improved her pain.  [AR 534-36.]

On May 16, 2008, Sedillos was seen by her PCP.  She requested a refill of Lortab.  She had headaches and a lump on her finger.  The record states: "Note: initial contact with patient was made; however, while obtaining lab or other medical records re: her, she left the exam room w/o being examined." [AR 388.]

On May 19, 2008, Sedillos was seen at the clinic again.  Pain and depression were noted, and she requested refills on her medication.  She was not seeing any counselors but had received a referral to neurology for her headaches.  Sedillos was given a referral to psychiatry for fibromyalgia and depression, and a refill of Lortab. [AR 386-87.]

On June 17, 2008, Sedillos was seen at the clinic for pain and depression.  She requested refills on medication for back pain and may have received them although the record is not clear.  She  She had not seen the rheumatology.  [AR 385.]

On June 24, 2008, Sedillos saw Dr. Dimmette, the neurologist, for an evaluation of her headaches that had started in her late 20s.  Sedillos described them as occurring three times a week and lasting 2-3 days.  She had lightheadedness, photophobia, phonophobia, nausea, and vomiting. An aura appeared prior to the onset of a headaches.  She could not function with the headaches.  The examination was normal.  Dr. Dimmette stated she had classic migraine headaches.  Lortab and other medications were refilled.  She was given Topamax for migraines. [AR 373.]

A brain MRI, dated July 18, 2008, was normal/negative. [AR 372.]

On July 22, 2008, Sedillos again saw Dr. Dimmette to follow up on the migraines.  Sedillos described the headaches were better with Topamax but that she had to discontinue its use due to side effects.  Now she has "constant bugging headaches," but denied severe headaches.  The motor

examination was 5/5 with normal bulk and tone.  Dr. Dimmette reinstated Topamax at a lower dose. and gave Sedillos refills on medications.  Her chronic issues required continued care and monitoring of prescription needs. [AR 371.]

On July 25, 2008, Sedillos was frustrated with the pain and requested refills on pain medications.  It appears that she received refills of Lortab and Lexapro. [AR 384.]

Sedillos worked for a financial company until early February 2008, and then revised her alleged onset of disability to July 9, 2008. [AR 23, 25.]

On August 21, 2008, Sedillos was seen at the Behavioral Health Institute.  The records indicate she was not receiving therapy but was instead only receiving medical management. Sedillos' chronic medical problems were now complicated by her sister's terminal illness. [AR 432, 433, 451-52.]

On August 26, 2008, Sedillos appears to have obtained a refill of Lortab. [AR 383.] In late August 2008, x-ray results of Sedillos' cervical spine, right shoulder, left shoulder and lumbosacral spine were all normal. [AR 379.]

On September 30, 2008, Dr. Garcia, a psychiatrist, saw Sedillos.  She was depressed, anxious, and frustrated, and felt increasingly anxious late in the day.  She was dressed all right, but slightly hunched over.  She exhibited apathy and her speech inflection was decreased.  Dr. Garcia increased Lexapro, and continued Ativan and Elavil. [AR 462.]

On October 2, 2008, Sedillos was seen at the clinic.  She had not yet seen the rheumatologist because she did not have insurance.  She stated she had been "fired when she asked to work part time."  The doctor noted that her borderline diabetes was controlled by Metformin.  He suggested a brace for her right wrist and that she walk more. A refill on Lortab was given. [AR 378.]

On October 29, 2008, Sedillos was again seen at the clinic for pain. She felt severe discomfort when twisting or moving, and had strained her back. The Lortab was refilled. [AR 377.]

On November 24, 2008, Sedillos did not show for an appointment with the psychiatrist. [AR 463.]

On December 2, 2008, Sedillos was seen for a cold. She was given a refill of Topamax. [AR 655.] Sedillos had a sleep study performed near this time and was diagnosed with sleep apnea. [AR 659.] On December 4, 2008, Sedillos was given Topiramate for her migraines. [AR 654.

On December 16, 2008, Sedillos was seen by Dr. Green and given a refill for Lortab and Meloxicam for arthritis pain. [AR 646.] She was also prescribed Topamax for migraines. [AR 651.] December 22, 2008 testing for cardiopulmonary disease was normal. [AR 504, 636.]

**2009**

Sedillos was seen regularly in early 2009 for pain, testing, and treatment. She still was taking Lortab. [AR 625, 630, 634.] On February 4, 2009, a pathology report indicated she had a tumor in her left jaw that needed excision. The lump was removed on this date. There was some indication Sedillos needed additional surgery but it is unclear if there were any more surgeries on this tumor. [AR 154, 467, 492, 499.] The pathology report indicated pleomorphic adenoma of the parotid gland that needed further excision. [AR 615, 616.]

On February 11, 2009, a physical RFC was performed. The limitations were occasional lifting of 10 pounds and frequent lifting of no amount of weight. She could stand, sit or walk less than two hours "per patient." This medical provider had never seen this patient before and observed that "all other providers" had not addressed possible limitations. There were no postural, manipulative or visual limitations. [AR 415.] This reviewing doctor did not have all the medical notes. [AR 421.]

23

On February 11, 2009, Sedillos was seen by Dr. Frederika Smith, a rheumatologist.  Sedillos complained of pain in her neck and shoulder and said that physical therapy had not helped, although there are no physical therapy records in the administrative record.  She had been diagnosed with fibromyalgia but her PCP wanted to rule out any other problems.  Sedillos' weight was stable although she lost 27 pounds a year ago after re-starting a prescription for Metformin.  She had been told she would need another surgery on her jaw.  None of the medications prescribed had really helped with the fibromyalgia symptoms.  Sedillos had had migraines for a long time but they were fairly well controlled with Topamax.  She still had break through migraines at times and used Imitrex.  She had anxiety and depression and was seeing a psychiatrist.  Sedillos exhibited multiple tender trigger points.  Her strength was 5/5 and her grip strength was 5/5.  Dr. Smith asked Sedillos to increase the Ibuprofen and decrease the Lortab.  Dr. Smith observed that Sedillos was to go to the lab for testing but had not yet arrived there even though she left the appointment two hours earlier. [AR 672-74.]

On February 23, 2009, an MRI of the spine showed mild degenerative disease.  She had some osteopenia. [AR 423, 424.] On February 23, 2009, Sedillos was seen at the clinic and received a refill of Lortab. [AR 614.] On February 24, 2009, a chest x-ray was normal. [AR 671.]

The ALJ hearing was held on February 27, 2009 in Santa Fe. [AR 21.] Sedillos had worked until July 2008 and was still receiving unemployment benefits. [AR 24.] She continued to look for part time work, but stated she did not feel well most of the time and could not perform full time work because of headaches, back aches, and "everything." [AR 25.] Doctors had told her she has fibromyalgia, kidney problems, migraines and pain.  If she did not feel well, she lay down.

During questioning by her attorney, Sedillos testified that her doctor had felt she needed to reduce her hours while working for the finance company and that her doctor had written a note to

24

this effect.  The note is not part of the administrative record.  The company let her go because she was away from the office too much.  Sedillos testified that she was uncomfortable when seated and tended to wiggle or shift.  She could sit for 20-30 minutes.  She could stand for 5-10 minutes, and could walk one minute. [AR 29-30.] She was wearing compression gloves that the doctor ordered for pain in her hands. [AR 30.] She suffered from weakness and cramping in her hands.  Her diabetes was well controlled with medication.  She had an upcoming surgery for the tumor in her jaw.  Her kidney problems were minor compared to fibromyalgia and migraine headaches. [AR 33.]

On April 6, 2009, Sedillos was seen for allergies and upper respiratory problems. [AR 669.] On April 16, 2009, Sedillos saw Dr. Garcia, the psychiatrist, as a "walk in" patient.  She suffered from increased anxiety and had stopped taking Lexapro because of taking too many pills.  She had the stress of parotid gland surgery.  She was prescribed Cymbalta and Remeron and advised to continue Ativan as needed. [AR 646.] On April 22, 2009, a Lortab prescription was refilled. [AR 667.]

On June 16, 2009, Sedillos did not show up for her appointment with the psychiatrist. [AR 446.]

On July 29, 2009, the ALJ issued an unfavorable decision on Sedillos' application for DIB. [AR 9-20.]

On August 3, 2009, Sedillos was seen at the clinic for pain and received trigger point injections. [AR 662, 663.] On August 10, 2009, she again did not show up for her appointment with the psychiatrist. [AR 465.]

On January 29, 2010, the Appeals Council denied the request for review. [AR 1.]

25

V.      **DISCUSSION**

A.      Alleged Legal Error

Sedillos argues that the ALJ's RFC finding was not supported by substantial evidence and is contrary to law based on medical evidence indicating diagnoses or complaints of fibromyalgia, back, and neck pain, migraine headaches, depression and anxiety.  Sedillos also challenges the ALJ's credibility findings. [Doc. 18.]

B.      RFC Findings

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  S.S.R. 96-8p, 1996 WL 374184, *1 (July 2, 1996).  In the present case, the ALJ was required to consider all factors that affect Sedillos' ability to perform the tasks involved in wage-earning activities.

The RFC assessment at step four of the sequential evaluation is comprised of three phases. Parise v. Astrue, 2010 WL 4846097, *2 (10th Cir. Nov. 30, 2010) (unpublished).

> In the first phase, the ALJ must evaluate a claimant's physical and mental . . . (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  At each of these phases, the ALJ must make specific findings.

Id. (citing Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996)).  With respect to phase one, the ALJ must consider all of the claimant's impairments, including impairments that are not severe, e.g., non-severe impairments of depression and pain in this case.  See id. (citing 20 C.F.R. §§ 404.1545, 416.945, and Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010)).

> While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities,

> it may–when considered with limitations or restrictions due to other
> impairments–be critical to the outcome of a claim.

S.S.R. 96-8p, 1996 WL 374184, *5 (July 2, 1996).

> In assessing RFC, the adjudicator must discuss the individual's
> ability to perform sustained work activities in an ordinary work
> setting on a regular and continuing basis (i.e., 8 hours a day, for 5
> days a week, or an equivalent work schedule), and describe the
> maximum amount of each work-related activity the individual can
> perform based on the evidence available in the case record.

Id., *7.

The limitations identified in the "paragraph B" and "paragraph C" criteria on the Psychiatric

Review Technique forms are used to rate the severity of mental impairments at steps 2 and 3.  Id.,

*4.  "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires

a more detailed assessment by itemizing various functions contained in the broad categories found

in paragraphs B and C of the adult mental disorders listings. . . ."  Pryce-Dawes v. Barnhart, 166 F.

App'x 348, 351 (10th Cir. Feb. 2, 2006) (unpublished) (citation omitted).

### 1)   *Fibromyalgia; back and neck pain; migraines*

Sedillos first asserts that the ALJ failed to properly consider the medical evidence of

fibromyalgia, related pain, and migraine headache pain in the RFC assessment. [Doc. 18, p. 4.]

In his decision, the ALJ determined at step two that fibromyalgia and migraine headaches

were severe impairments. [AR 14.] At step four, the ALJ assessed Sedillos' RFC as being able to

perform a full range of light work.  Thus, she would not be precluded from lifting more than 20

pounds at a time, and could frequently lift or carry 10 pounds.  Light work requires "a good deal of

walking or standing, or when it involves sitting most of the time with some pushing and pulling of

arm or leg controls." [AR 16.]  The ALJ concluded Sedillos could perform a full range of light work,

which means she also could perform sedentary work. [AR 16.]

27

In making the RFC assessment, the ALJ relied on evidence of Sedillos' work history in 2007 and 2008 and her testimony that she still was looking for employment. [AR 16-17.] The ALJ also considered Sedillos' testimony that pain, headaches, and back aches prevented her from performing full time work. [AR 17.] The ALJ discussed Sedillos' migraine headaches, the diagnosis of fibromyalgia, her allegations that she began having pain in her shoulders and neck in about 2001, her problems sleeping, and her testimony that she could sit for only 20-30 minutes, stand 5-10 minutes and walk for 5 minutes before having pain.  He also considered her testimony that her hands were weak and that she was prescribed compression gloves by a rheumatologist.

The ALJ observed that numerous medical notes chronicled Sedillos' treatment for fibromyalgia and evidenced her complaints of pain, but found that the medical records did not provide "any objective evidence of limitations." [AR 18.] The ALJ specifically referenced and discounted an RFC assessment, dated February 11, 2009, from Dr. Thomas Strain of the El Centro Family Health clinic, where Sedillos was seen by various providers. [AR 18, 416.] Dr. Strain noted exertional limitations of occasional lifting of 10 pounds, frequent lifting of no weight, standing or walking for less than two hours a day, sitting for less than 6 hours a day, and unlimited pushing or pulling. [AR 416.] However, as noted by the ALJ, Dr. Strain described these limitations as "per patient." [AR 18, 416.] Dr. Strain further found no postural, manipulative, visual, communicative or environmental limitations. [AR 417-19.] Dr. Strain observed that Sedillos had been coming to this clinic since about 2004 and was diagnosed with fibromyalgia.  He stated that records from previous provider were requested by not received, and that Sedillos was seeing a number of other health care providers, including a neurologist, rheumatologist, and psychiatrist. [AR 420.] Because Dr. Strain had only subjective allegations to consider, the ALJ gave Dr. Strain's RFC assessment "no significant weight." [AR 18.]

Although not expressly relied on by the ALJ, the record reflects that Dr. Vining, a disability services physician, assessed Sedillos' RFC in August 2007. More consistent with the ALJ's conclusions, Dr. Vining found that Sedillos could lift 50 pounds occasionally and half that weight frequently.[18] According to Dr. Vining, Sedillos could sit, stand or walk for up to six hours a day and had no limitations in her ability to push or pull. While not finding any significant postural limitations or limitations in pushing, pulling, or lifting, Dr. Vining did note a variety of other medical conditions that would impact Sedillos' RFC, specifically fibromyalgia that was "always present," along with pain in the back, shoulder, leg and flank. [AR 312.] Dr. Vining further observed that Sedillos was frequently treated with anti-depressants and narcotic pain killers. She stated that while the medical evidence of record did not include the original diagnosis of fibromyalgia, the condition was a "well established" medically determinable impairment ("MDI"). Dr. Vining also noted medical record evidence indicating that at least one treating physician suspected an emotional overlay to some of Sedillos' symptoms. [AR 313.][19]

In his decision, the ALJ also did not find Sedillos entirely credible as to the exertional limitations about which she testified, based on inconsistencies in her testimony and documentary evidence. [AR 19.] The ALJ then determined that she was capable of performing her past relevant "sedentary to light work as a substitute teacher, childcare provider, administrative assistant, and clerk with a finance company," as those jobs are customarily performed. [AR 19.]

---

[18]The ALJ actually found more physical limitations than did Dr. Vining in her RFC assessment. [AR 311.]

[19]It is not clear why the ALJ chose to discuss the later RFC assessment by Dr. Strain that the ALJ discounted but did not address Dr. Vining's RFC assessment, that was more consistent with the ALJ's findings. However, perhaps Dr. Vining's assessment presented internal inconsistencies that would have required resolving, *e.g.,* ability to lift 50 pounds occasionally yet fibromyalgia was a well established MDI. It also was in some conflict with Dr. Strain's RFC assessment.

The Court is troubled with the ALJ's conclusion that Sedillos' impairments, including fibromyalgia and related pain, did not interfere with her RFC to perform a full range of light work. The ALJ made little mention of Sedillos' numerous diagnoses of fibromyalgia, multiple complaints of pain, repeated visits to the hospital for pain medication, and consistent prescriptions of narcotic pain killers over a period of years, along with Sedillos' many allegations of significant pain, in multiple sites. [*See, e.g.,* AR 374 (intermittent headaches); AR 221-220 (lower back pain); AR 259 (neck, shoulder, and back pain); AR 256, 257 (chronic pain); AR 254 (acute migraine); AR 250, 253 (neck, back, shoulder, and calf pain; AR 225, 229 (acute left flank pain; pain in legs and hands)].

In 2007, Sedillos was seen in a medical clinic at least seven times for complaints of pain in her head (migraines), neck, shoulders, lower back, wrists, jaw, and trigger points. [AR 249, 250, 324, 354-57, 411, 412.] She was admitted to a hospital three times that year relating to pain. [AR 232, 571, 591.] She visited a psychiatrist at least two times in 2007, when chronic pain was documented. [AR 326, 445.] She was treated with narcotic pain killers throughout 2007.

In 2008, the records are similar. She was seen at the medical clinic about 17 times for various complaints of pain. [AR 371, 373, 377, 378, 383-88, 390, 401, 403-04, 406, 646, 654.] She was admitted to the hospital two times that year relating to complaints of pain. [AR 530, 541, 562.] She saw a psychiatrist where chronic pain was documented on several occasions. [AR 433, 435, 462.] Again, she was treated with narcotic pain relievers throughout 2008.

In reaching his RFC finding, the ALJ relied primarily on a single evaluation by the neurologist as to Sedillos' general appearance, state of orientation, memory, and muscle strength, bulk, and tone. [AR 18.] The ALJ concluded that the numerous medical notes chronicling Sedillos' condition and complaints were not "objective evidence of limitations." Fibromyalgia, however, does not lend itself to objective medical testing. Thus, the Court does not find substantial support

for the ALJ's RFC findings and concludes that a reevaluation of Sedillos' condition, including her history and diagnoses of fibromyalgia, is necessary in assess her RFC.

Oftentimes, a claim of fibromyalgia is met with some skepticism because of the lack of objective findings to support the condition.  In this case, Sedillos has had multiple x-rays, CT scans, MRIs, lab work, and physical examinations that were normal and inconsistent with her claims of an inability to work due to fibromyalgia. [*See, e.g.,* AR 374 (physical exam normal); AR 268-69 (thoracic spine x-rays normal); AR 175 (CT scan of abdomen/pelvis normal); AR 170 (ultrasound for hematuria normal); AR 284, 286, 290 (CT urogram "unremarkable"); AR 311-315 (MRI spine negative); AR 349 (x-ray of chest normal); AR 379 (x-ray of cervical spine, right shoulder, left shoulder and lumbosacral spine all normal); AR 591-96 (CT scan of chest negative); AR 541, 544, 545 (motor exam and all testing normal); AR 372 (brain MRI negative/normal)].  Thus, the absence of objective findings appears to support the ALJ's conclusions.  However, case law cautions against that leap.

In Wilson, 602 F.3d at 1143, the Tenth Circuit observed that "complaints of severe pain that do not readily lend themselves to analysis by objective medical tests are notoriously difficult to diagnose and treat, and the diagnoses themselves are often overlapping."  (*citing, e.g.,* Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998)) ("[N]o one questions that fibromyalgia is very difficult to diagnose, that no objective medical testes reveal its presence, and that it can be completely disabling.") (citations omitted).

The Tenth Circuit recognized, in Welch v. UNUM Life Ins. Co. of Am., 382 F.3d 1078, 1087 (10th Cir. 2004) that: "[b]ecause proving the disease is difficult, fibromyalgia presents a conundrum for insurers and courts evaluating disability claims."  (quotation and alteration omitted).  The Seventh Circuit described fibromyalgia as follows:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia.  The primary symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and–the only symptom that discriminates between it and other diseases of a rheumatic character–multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) (*cited with approval* in Gilbert v. Astrue, 231 F. App'x 778, 783, 2007 WL 1068104 (10th Cir. Apr. 11, 2007)) (unpublished).

In Gilbert, the ALJ acknowledged that the applicant probably had fibromyalgia and that there was a clinical examination finding multiple tender points over various parts of the body.  231 F. App'x at 783-84.  The Court found, however, that the ALJ "relied expressly on objective test results showing only mild degeneration in [the applicant's] back and knees, and other test results indicating her peripheral neuropathy was also mild."  Other reasons cited by the ALJ in Gilbert for discounting a physician's conclusions were an instance of successful physical therapy, the extent of the applicant's exercise, and a lack of complaints during various medical appointments.  Id.  The Tenth Circuit observed that "the lack of objective test findings noted by the ALJ is not determinative of the severity of her fibromyalgia."  Id. at 784.

In another Tenth Circuit decision, the Court defined fibromyalgia as follows:

> Fibromyalgia . . . is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissue."  It is a chronic condition, causing "long-term but variable levels of muscle and joint pain, stiffness and fatigue."  The disease is "poorly-understood within much of the medical community [and] . . . is diagnosed entirely on the basis of patients' reports and other symptoms."

Brown v. Barnhart, 182 F. App'x 771, 773 n.1, 2006 WL 1431446 (10th Cir. May 25, 2006) (unpublished) (internal citations omitted).  In Brown, the Tenth Circuit further observed that the

ALJ's reliance on the applicant's full muscle strength in her arms and legs and testing results of only mild abnormalities was error.  "[N]ormal muscle strength and a lack of results from objective laboratory tests for the presence or severity of fibromyalgia do not rule out the possible existence of the condition.  "The mere fact that fibromyalgia cannot be 'conclusively diagnosed in a laboratory setting' does not exclude it from coverage per se."  Id., at 774 (citations omitted).  *See also* Moore v. Barnhart, 114 F. App'x 983, 990-92, 2004 WL 2634571 (10th Cir. Nov. 19, 2004) (patients with fibromyalgia "usually look healthy.  Their joints appear normal, and further musculoskeletal examination indicates no objective join swelling, although there may be tenderness on palpation.  In addition, muscle strength, sensory functions, and reflexes are normal despite the patient's complaints of acral numbness.")

Certainly, Sedillos has a well-documented medical history of problems with pain all over her body, migraine headaches, fatigue, and sleep difficulties, along with numerous and continuous prescriptions for narcotic and other pain killers, trigger point injections, and intravenous injections of medications while admitted to the hospital.  The Court elects to remand for additional administrative proceedings so that the ALJ can reassess Sedillos' diagnosis of fibromyalgia and pain, as they relate to her RFC, consistent with guidance from the Tenth Circuit's opinions discussing this condition.  The ALJ should keep in mind that the symptoms of fibromyalgia generally are subjective and that there is no exact battery of tests that confirms fibromyalgia and related pain.

In addition, on remand, the ALJ must follow the proper legal standards for evaluation of Sedillos' pain testimony and must "closely and affirmatively link [] [his findings] to substantial evidence."  Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004) (quotation omitted).  In so doing, the ALJ should carefully evaluate evidence of Sedillos' repeated attempts to seek medical

relief for her pain, the numerous medications she has taken over a period of years, and her various other attempts to alleviate pain.

2) ***Depression and Anxiety***

The ALJ did not find Sedillos' allegations of depression and anxiety to be severe at step two, and Sedillos does not expressly challenge the step two findings. Because the Court is remanding the case, the ALJ should reassess for purposes of step two, any well-documented complaints and diagnoses of depression and anxiety, along with the consistent treatment of depression/anxiety with anti-depressants and anti-anxiety medications.

If the alleged depression or anxiety is not severe at step two, the ALJ must nonetheless provide, at steps four and five of the sequential evaluation, a more detailed assessment, including an itemization of various functions contained in broad categories found in paragraph B of the adult mental disorders listings. While the ALJ correctly noted this language in his decision [AR 16], it is less clear that he actually provided that detailed assessment at steps four and five, with respect to Sedillos' allegations of depression and anxiety.

On remand, the ALJ should address the three phases described above with respect to the step four RFC determination.

C.    Credibility Finding

The ALJ must consider the credibility of the claimant's subjective testimony about her pain and its effect on her ability to work. S.S.R. 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Credibility findings are "peculiarly the province of the finder of fact, and . . . [will not be] upset . . . when supported by substantial evidence." Kepler v Chater, 68 F.3d 387, 391 (10th Cir. 1995) (internal citations and quotations omitted). Because the credibility findings in this case are

intertwined with Sedillos' claims of disabling pain, the ALJ should consider her claims of pain and fibromyalgia in reevaluating her credibility on remand.

The Court is aware that there are inconsistencies in the record, and that Sedillos' reports of alleged disability are not always consistent with her activities. Indeed, while professing she could not work, her actual work history belies the claim. The ALJ should carefully reexamine any inconsistent records, including those from 2005, where Sedillos' PCP observed that there might be a psychiatric overlay to Sedillos' allegations of fibromyalgia with chronic pain. [*See, e.g.,* AR 262, 268.] Sedillos was not always compliant with the drug contract she signed in requesting refills of narcotic pain relievers, although the later medical records do not chronicle problems as to Sedillos' compliance with a drug contract. Instead, she was repeatedly given refills for prescriptions of narcotics.

So, too, Sedillos has a history of "no shows" for various examinations, appointments, and treatment. [*See, e.g.,* AR 198 (no show for counseling); AR 261 (no show at Health Center); AR 253, 256 (no show with Dr. McNally); AR 326-29 (did not attend scheduled appointments); AR 440 (failed to show for counseling appointment and did not respond to follow-up letter); AR 463 (no show for psychiatric appointment)]. This history is properly considered in determining Sedillos' effort to improve her physical or emotional condition.

The Court further observes that Sedillos did not appear for a consultative mental health examination that apparently was not re-scheduled. In addition, there are no mental RFCs in the record as the reviewing psychiatrists never had sufficient evidence to evaluate Sedillos' mental functioning. [AR 297, 365.] The ALJ may elect to order a consultative examination and obtain a mental RFC, if possible, to assist in the reevaluation of Sedillos' RFC.

## VI.    <u>RECOMMENDATION</u>

The Court recommends that Sedillos's motion to reverse or remand be GRANTED, and that this matter be remanded for additional administrative proceedings, as described herein.

_____
Lorenzo F. Garcia
United States Magistrate Judge